Submitted June 27, 2008, resubmitted en banc August 12, reversed and remanded
September 30, petition for review allowed November 5, 2009 (347 Or 317)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# THOMAS GREGORY MACHUCA,
*Defendant-Appellant.*

Multnomah County Circuit Court
050647097; A133362

218 P3d 145

Peter Gartlan, Chief Defender, Legal Services Division, and Travis Eiva, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Schuman, Ortega, Rosenblum, and Sercombe, Judges, and Riggs, Senior Judge.

SERCOMBE, J.

Haselton, J., dissenting.

## SERCOMBE, J.

After a conditional guilty plea, defendant was convicted of driving under the influence of intoxicants (DUII). ORS 813.010. He assigns error to the trial court's denial of his motion to suppress evidence of his blood alcohol content obtained after he consented to a blood draw. Defendant argues that the blood draw was obtained in violation of Article I, section 9, of the Oregon Constitution.[1] For the reasons explained below, we reverse and remand.

■ We review the denial of a motion to suppress for errors of law and are bound by the trial court's factual findings that are supported by sufficient evidence in the record. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Thus, we take the salient facts in this case primarily from the trial court's findings.

Defendant was involved in a single-car accident on Naito Parkway in Portland; he suffered injuries and was transported to the hospital emergency room facilities at Oregon Health and Science University (OHSU). Officer Oelke, the first officer on the scene, arrived at approximately 1:52 a.m. Officer Ladd arrived a few minutes later and took over the investigation. By 2:10 a.m., Ladd concluded that there was probable cause to believe that defendant had committed the crime of DUII. Ladd then went to OHSU to investigate further.[2]

After Ladd's arrival, hospital personnel allowed him to enter the emergency room facilities through a locked entry door, and he was directed by security staff to "emergency room two." Defendant was alone in the room, "lying on a hospital bed receiving some care." There was a very strong smell

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] The trial court found that Ladd "learned of defendant's alleged intoxicated driving and impairment at 2:10 a.m." That finding is supported by sufficient evidence in the record. *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993) (binding effect of trial court's findings of fact that are supported by sufficient evidence).

of alcohol in the room. Defendant, snoring loudly and in a deep sleep, was slow to wake. Ladd asked defendant several questions to evaluate his comprehension. Ladd explained why he was there and that defendant was under arrest for DUII and reckless driving. He gave defendant *Miranda* warnings and asked defendant questions from the standard DUII Interview Report form. Defendant responded to the questions slowly but directly. Ladd testified that defendant "understood he'd bee[n] in a wreck, knew where he was, he was in Portland at the hospital * * *. So he was fully aware of his situation, surroundings and why he was at the hospital." Then Ladd read defendant his Driver and Motor Vehicle Services Division "implied consent rights and consequences" and asked defendant if he would like to take a blood test.[3] Defendant agreed to take the test, and Ladd summoned a

---

[3] ORS 813.100 provides:

"(1) Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the implied consent law, to a chemical test of the person's breath, or of the person's blood if the person is receiving medical care in a health care facility immediately after a motor vehicle accident, for the purpose of determining the alcoholic content of the person's blood if the person is arrested for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. A test shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. Before the test is administered the person requested to take the test shall be informed of consequences and rights as described under ORS 813.130.

"(2) No chemical test of the person's breath or blood shall be given, under subsection (1) of this section, to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described under ORS 813.130.

"(3) If a person refuses to take a test under this section or if a breath test under this section discloses that the person, at the time of the test, had a level of alcohol in the person's blood that constitutes being under the influence of intoxicating liquor under ORS 813.300, the person's driving privileges are subject to suspension under ORS 813.410 and the police officer shall do all of the following:

"(a) Immediately take custody of any driver license or permit issued by this state to the person to grant driving privileges.

"(b) Provide the person with a written notice of intent to suspend, on forms prepared and provided by the Department of Transportation. The written notice shall inform the person of consequences and rights as described under ORS 813.130.

nurse who administered the test, extracting defendant's blood at 3:18 a.m.[4]

"(c) If the person qualifies under ORS 813.110, issue to the person, on behalf of the department, a temporary driving permit described under ORS 813.110.

"(d) Within a period of time required by the department by rule, report action taken under this section to the department and prepare and cause to be delivered to the department a report as described in ORS 813.120, along with the confiscated license or permit and a copy of the notice of intent to suspend.

"(4) If a blood test under this section discloses that the person, at the time of the test, had a level of alcohol in the person's blood that constitutes being under the influence of intoxicating liquor under ORS 813.300, the person's driving privileges are subject to suspension under ORS 813.410 and the police officer shall report to the department within 45 days of the date of arrest that the person failed the blood test."

ORS 813.130 requires information about implied consent rights and responsibilities to be in the form prepared by the Department of Transportation. ORS 813.130(2) provides:

"The information about rights and consequences shall be substantially as follows:

"(a) Driving under the influence of intoxicants is a crime in Oregon, and the person is subject to criminal penalties if a test under ORS 813.100 shows that the person is under the influence of intoxicants. If the person refuses a test or fails, evidence of the refusal or failure may also be offered against the person.

"* * * * *

"(c) If the person refuses or fails a test under ORS 813.100, the person's driving privileges will be suspended. The outcome of a criminal charge for driving under the influence of intoxicants will not affect the suspension. The suspension will be substantially longer if the person refuses a test.

"(d) If the person refuses a test or fails a breath test under ORS 813.100 and has an Oregon driver license or permit, the license or permit will be taken immediately and, unless the person does not currently have full valid driving privileges, a temporary driving permit will be issued to the person.

"(e) If the person refuses a test under ORS 813.100, the person will not be eligible for a hardship permit for at least 90 days, and possibly for one year, depending on the person's driving record. The person may possibly qualify for a hardship permit in 30 days if the person fails a test, depending on the person's driving record.

"(f) If the person refuses a breath test under ORS 813.100, the person is subject to a fine of at least $500 and not more than $1,000.

"(g) After taking a test under ORS 813.100, the person will have a reasonable opportunity, upon request, for an additional chemical test for blood alcohol content to be performed at the person's own expense by a qualified individual of the person's choosing."

[4] In addition, the hospital had already conducted a blood test on defendant and, when he left OHSU, Ladd was advised that the test had determined defendant's blood alcohol content to be .274.

Defendant was charged with reckless driving and DUII. He moved to suppress the evidence obtained by the officer at the hospital, arguing that it was obtained in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The trial court denied the motion, concluding:

> "The state established its burden of proving, by a preponderance of the evidence, that the defendant's consent to have his blood drawn and analyzed was given voluntarily based on the totality of the circumstances. The state did not meet its burden, however, with respect to the second proffered exception to the warrant requirement, *i.e.* the existence of probable cause and exigent circumstances. More specifically, the state failed to prove that the evidence it sought would have been sacrificed by the time it would take the officers to obtain a search warrant."

Based on that ruling, defendant entered a conditional plea of guilty, reserving the right to appeal the trial court's denial of his motion to suppress. This appeal followed.

On appeal, defendant advances three arguments in support of his assignment of error. First, he argues that his warrantless arrest in the hospital room was unlawful and that all of the evidence obtained in the hospital room should be suppressed, including evidence of the results of the blood test, his physical appearance, and his admissions. Next, defendant contends that the state did not prove that he voluntarily consented to the blood test so as to excuse the need for a search warrant. Third, and finally, he asserts that the state failed to prove that a warrant was not necessary due to exigent circumstances, specifically that evidence of his intoxication would have been lost by the time a warrant was obtained. We address each argument in turn.

First, defendant submits that his arrest was unlawful because an arrest warrant was needed before entering the emergency treatment room. Defendant explains that he had a protected privacy interest in the hospital room setting analogous to that enjoyed in one's home. That argument is controlled by our decision in *State v. Cromb*, 220 Or App 315, 185 P3d 1120, *rev den*, 345 Or 381 (2008), which was decided after briefing and oral argument in the present case. In

*Cromb*, we rejected the contention that the defendant had a constitutionally protected privacy interest, under either the state or federal constitution, in the area of the emergency room where he was being treated and that the officer's entry into that area and his observations of the defendant's condition constituted a warrantless search that violated that interest. *Id*. at 319, 327. The defendant in *Cromb* relied on state statutory policies on the unauthorized disclosure of medical information to buttress the claim of a protected privacy interest. *Id*. at 320. We noted that "with a few possible exceptions, privacy interests can be recognized only by their association with a *private* place where the claimant has the right to exclude others." *Id*. at 325 (emphasis in original). We concluded that "[t]he hospital emergency room in this case, even a curtained-off portion of it, is not a private place." *Id*. at 325-26.

That same result obtains here. Ladd was admitted to defendant's treatment area by hospital staff. Defendant had no right to restrict access to his treatment area by controlling whether police officers might be present there. The area was associated with the hospital emergency room and was not provided to defendant for his sole use. We conclude that *Cromb* is controlling and reject defendant's argument without further discussion. Defendant's arrest was lawful, and the trial court did not err in failing to suppress evidence of Ladd's observations in the hospital treatment room during the arrest.

■■■ The next question is whether particular evidence—defendant's blood—was seized in accordance with defendant's constitutional rights. Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *." "The extraction of a blood sample by the police is both a search of the person and a seizure of an 'effect'—the person's blood." *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988). Warrantless searches and seizures are *per se* unreasonable unless the state proves an exception to the warrant requirement. *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). The state contends that the search and seizure were reasonable because defendant gave

consent and alternatively because it fell within the exigent circumstances exception to the warrant requirement.

Defendant argues that his consent was coerced and cannot be regarded as a free exercise of his will. The consent was coerced, according to defendant, because it was obtained after he was warned that he would incur substantial penalties if he did not consent. The trial court recognized that the implied consent proclaimed by ORS 813.100 "cannot be regarded as a free exercise of will." The trial court concluded that defendant's consent was voluntary, however, after reviewing the factors that contribute to a determination of voluntariness.

In reviewing the voluntariness of a person's consent to a search, "[w]e are not bound by the trial court's ultimate holding as to voluntariness, * * * [but] assess anew whether the facts suffice to meet constitutional standards." *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991). The proper test for voluntariness is whether, under the totality of the circumstances, the consent was given by an act of free will or was the result of coercion, express or implied. *State v. Dimeo*, 304 Or 469, 474, 747 P2d 353 (1987); *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983). The state bears the burden of proving voluntariness by a preponderance of the evidence. *State v. Paulson*, 313 Or 346, 351-52, 833 P2d 1278 (1992).

The relevant factors to be considered in determining the voluntariness of consent include (1) whether physical force was used or threatened; (2) whether weapons were displayed; (3) whether the consent was obtained in public; (4) whether the person who gives consent was the subject of an investigation; (5) the number of officers present; (6) whether the atmosphere surrounding the consent was antagonistic or oppressive; and (7) whether drug or alcohol use has impaired the defendant's ability to make a knowing, voluntary, and intelligent choice. *State v. Larson*, 141 Or App 186, 198, 917 P2d 519, *rev den*, 324 Or 229 (1996).

Some of those factors suggest that defendant's consent was not voluntary. Defendant gave consent after he was placed under arrest, shortly after being injured in an automobile accident, and while under the influence of alcohol. On

the other hand, defendant's assent did not result from the use of physical force or the display of weapons. What is determinative in this context, however, is that the consent was procured through a threat of economic harm and loss of privileges. It was obtained only after defendant was given the warnings required by ORS 813.130(2) about the consequences of a refusal to allow a blood test. Under *State v. Newton*, 291 Or 788, 801, 636 P2d 393 (1981), *overruled in part on other grounds by State v. Spencer*, 305 Or 59, 750 P2d 147 (1988), a consent to search obtained in that fashion is coerced by the fear of adverse consequences and is ineffective to excuse the requirement to obtain a search warrant.

In *Newton*, the defendant was arrested for DUII and was asked to take a Breathalyzer test. He responded by asking for an opportunity to telephone counsel. The officer interpreted defendant's request as a refusal, and he read to the defendant from the implied consent statutes, including the legal consequences of failing to submit to the test. Before trial, the defendant moved to suppress the results of the Breathalyzer test. The trial court granted his motion on the grounds that "defendant was entitled to a telephone call to consult with a lawyer before taking the test." *Id.* at 791.

The Supreme Court reversed. The plurality opinion by Justice Tanzer was joined by Chief Justice Denecke and Justice Campbell. The opinion first analyzed whether suppression of the evidence was warranted under Article I, section 9, because it was obtained without a search warrant. It concluded that the consent for the search and seizure was coerced, but that the search and seizure was justified because there was probable cause to search and a warrant was excused by exigent circumstances. *Id.* at 800-02.

After reviewing the history and purpose of Oregon's implied consent law, a plurality of the court noted that "the consent envisioned by the statute is to be implied and if submission is not forthcoming, it is to be coerced by fear of adverse consequences." *Id.* at 799-800. In concluding that the "[d]efendant's statutorily implied consent cannot excuse an otherwise unconstitutional seizure[,]" the court held:

> "Where a person's consent to a seizure is solicited, and the person consents only after being warned that he will suffer

a substantial penalty if he refuses, the resulting consent cannot be regarded as a free exercise of will. We therefore hold that defendant's submission to the breath test was not a voluntary consent to seizure because it was coerced."

*Id.* at 801. The plurality opinion found that the warrantless search was nonetheless "not forbidden by * * * Article I, section 9, because there was both probable cause to believe that defendant's breath contained evidence of intoxicants and exigent circumstances making it likely that the evidence would dissipate if time were taken to obtain a warrant for its seizure." *Id.* at 801.

The opinion further noted that the constitutional limitations on unreasonable searches and seizures did not prevent a compelled extraction of blood "over the refusal of the person and the objection of his lawyer." *Newton,* 291 Or at 801. It then held that

"the police could have lawfully compelled defendant to provide a breath sample for testing regardless of whether defendant called a lawyer and regardless of whether defendant had refused to submit to the seizure.

"* * * * *

"* * * No right of counsel is implied by the right of freedom from unreasonable seizures."

*Id.* at 802.

Finally, the *Newton* plurality determined that the state need not allow consultation with an attorney before a breath test under the Article I, section 11, right to counsel "in all criminal prosecutions." It concluded that the criminal prosecution only commences at the time of the "formal charge" of the crime. 291 Or at 804-05. The plurality found, however, that the threat of adverse consequences if the defendant telephoned counsel was a violation of the Due Process Clause of the Fourteenth Amendment, but that the constitutional violation did not require the exclusion of the evidence. *Id.* at 808-09. The court reversed the suppression order. *Id.* at 813.

Justice Tongue concurred "in the result reached by the opinion by Tanzer, J." The concurrence, however,

expressly questioned the "holding that the right of a person arrested to call an attorney is a constitutional 'liberty' under the Fourteenth Amendment of the Constitution of the United States." *Id.* at 813. Instead, Justice Tongue agreed with the dissent that the right to consult with counsel prior to a breath test was statutory in nature. *Id.* at 813-14. However, Justice Tongue would not have excluded the evidence because of a statutory violation. *Id.* at 814.[5]

Thus, in light of *Newton* and the other factors discussed above (the facts that defendant had just been arrested, had been injured in a car accident, and was under the influence of intoxicants), defendant's consent was not voluntary for the purposes of Article I, section 9.[6] The trial court erred in denying defendant's motion to suppress on the basis that defendant voluntarily consented to the blood test.

The dissent asserts that we are not bound to the conclusion reached by the *Newton* plurality on the coercive consent issue for four reasons: (1) the conclusion was reached in a plurality opinion, not a majority opinion, of the Supreme Court; (2) the conclusion was not essential to the result reached by the court; (3) the conclusion has not been relied on in subsequent cases; and (4) the conclusion is wrong. 231 Or App at 248-50 (Haselton, J., dissenting). We share some of the dissent's misgivings on the abstract correctness of the conclusion reached in *Newton*. We do not decide whether a different result would obtain if other ingredients were added to the stew, factors that were not present in *Newton* and are

---

[5] In *State v. Spencer*, 305 Or 59, 74-75, 750 P2d 147 (1988), the Supreme Court overturned its Article I, section 11, holding in *Newton*, concluding that, "under the right to counsel clause in Article I, section 11, an arrested driver has the right upon request to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." Under the facts of that case, the court accordingly suppressed the results of the breath test. *Id.* at 76.

[6] Under the statutes in effect at the time of the arrest in *Newton*, a suspect was asked to consent to a breath or blood test, and, if a test was declined, the suspect was then warned of the consequences of refusal. The state argues that *Newton* applies "only [to] warnings that are given after a DUI[I] suspect initially refuses to consent to a seizure of his breath or blood." The state relies on a distinction without a difference. In the present case, defendant "consented" immediately following Ladd's reading of the implied consent law and the request for a blood draw. He was told the substantial penalty he would suffer if he failed to consent, was asked to comply, and did so rather than risk further penalty. That scenario involves precisely the coerciveness the Supreme Court addressed in *Newton*.

not before us in this case, *e.g.*, consultation of a defendant with counsel before granting consent.

However, we cannot turn a blind eye, as the dissent suggests, to a determination by a majority of the Supreme Court that is labeled as a holding by the court and is relevant to the outcome reached by that majority and that has not been distinguished, questioned, or implicitly overturned in subsequent opinions of that court. 231 Or App at 248-50 (Haselton, J., dissenting). First, the force of the plurality opinion in *Newton* on Article I, section 9, issues is not dissipated by a concurrence that quibbles with the plurality on *different issues* arising under Article I, section 11, and the Due Process Clause. Justice Tongue's concurrence begins:

> "I concur in the result reached by the opinion by Tanzer, J. I question, however, its holding that the right of a person arrested to call an attorney is a constitutional 'liberty' under the Fourteenth Amendment of the Constitution of the United States. No such contention was made by defendant in this case. I agree that a person arrested has a right to call an attorney, but am not prepared to hold at this time that such a right is a constitutional 'liberty' under the Fourteenth Amendment."

*Newton*, 291 Or at 813. That concurrence states no difference with the plurality on the first of two issues decided in the case—that suppression of the evidence was not required under Article I, section 9. It is the reasoning of that part of the plurality opinion that we apply in this case.[7]

Second, the plurality's conclusion on the coercive consent issue was important to that result under Article I,

---

[7] The *Newton* plurality opinion announces the opinion of the court with respect to the analysis under Article I, section 9, in light of the views expressed in the separate concurring and dissenting opinions. We reached a similar conclusion regarding the precedential effect of a plurality opinion in *Estate of Michelle Schwarz v. Philip Morris Inc.*, where we stated:

> "Justice Stevens authored the opinion on which we rely. [*See Cipollone v. Liggett Group, Inc.*, 505 US 504, 521, 112 S Ct 2608, 120 L Ed 2d 407 (1992) (plurality opinion).] That opinion is, in part, the opinion of the Court and, in part, an opinion of the plurality. In common with most other courts, we conclude that, in light of the views expressed in the separate concurring and dissenting opinions of Justices Blackmun and Scalia, the entirety of Justice Stevens's opinion states the holding of the Court."

206 Or App 20, 29 n 4, 135 P3d 409 (2006), *rev allowed*, 346 Or 213 (2009).

section 9, in two ways. The plurality concludes that the defendant's consent was ineffective to excuse the need to obtain a warrant in order to permit the breath test. That conclusion decided one of two arguments made by the state to support reversal of the suppression order under Article I, section 9, the other being that the warrant was not required because of exigent circumstances. Although it is true, as the dissent observes, that the court could have avoided analysis of the effectiveness of the defendant's consent and decided to reverse the suppression order under Article I, section 9, solely on the lack of exigent circumstances, *that is not what the court did*. Instead, it determined that the consent was involuntary and highlighted its conclusion as a holding: "*We therefore hold that* defendant's submission to the breath test was not a voluntary consent to seizure because it was coerced." *Newton*, 291 Or at 801 (emphasis added). The dissent's classification of this conclusion as mere *dictum* is inconsistent with the express wording of the opinion. 231 Or App at 248, 249-50 (Haselton, J., dissenting).

Moreover, the conclusion regarding coercive consent was then used by the plurality to make a third holding on the Article I, section 9, issues. According to the plurality, the absence of a valid consent amounted to a "refusal" by the defendant to take the breath test. The opinion concluded that "neither [Article I, section 9, nor the Fourth Amendment] prohibits the police from compelling a person to submit to physical extraction of blood over the refusal of the person and the objection of his lawyer." *Newton*, 291 Or at 801. The opinion then stated that the "dominant constitutional principle of this case" is that "the police could have lawfully compelled defendant to provide a breath sample for testing regardless of whether defendant called a lawyer *and regardless of whether defendant had refused to submit to the seizure*. Therefore, we conclude that the *search and seizure provisions of neither constitution* were violated." *Id.* at 802 (emphasis added). The absence of a valid consent or "refusal to submit to the seizure" was a necessary predicate to the court's holding that the "search and seizure provisions of neither constitution were violated." Contrary to the dissent's arguments, then, the coercive consent conclusion in the case was not *dictum*.

Third, it is immaterial that *Newton*'s conclusion on the coercive nature of the implied consent disclosures has not been ratified in subsequent opinions.[8] What is more probative is that that conclusion has not been questioned or confined in subsequent decisions of the Oregon Supreme Court, notwithstanding the reversal of other parts of the *Newton* opinion in *Spencer*. Other Supreme Court decisions have applied a "totality of the circumstances" test to assess whether a consent to search was voluntary. *See, e.g., Paulson*, 313 Or at 351-52; *Stevens*, 311 Or at 136; *Wolfe*, 295 Or at 572. *Newton* should be understood consistently with that "totality of the circumstances" test. There may be circumstances where the coercive effect of the disclosures is mitigated sufficiently to allow a conclusion that the consent was voluntary. Those circumstances are not present here.

But to conclude, as does the dissent, that the coercive effect of the disclosures is immaterial to the question of whether defendant's consent was voluntary, because those disclosures are compelled by statute, gives an undue determinative effect to that factor in the constitutional equation. 231 Or App at 249-50 (Haselton, J., dissenting). Legislative choices have no such effect in other constitutional inquiries. And, as we have said, *Newton*'s directive is quite to the contrary. We turn, then, to the question of whether the blood test can be justified on alternative grounds.

■ Notwithstanding the ineffective consent to search and seize, the blood test could be justified as based on probable cause and the necessity to preserve the diminishing evidence of intoxication. Defendant responds that, although Ladd developed probable cause that he had committed DUII, the officer conceded that he could have obtained a telephonic search warrant in one hour. Defendant argues that, because one hour and eight minutes elapsed between the time when probable cause arose and when the blood was extracted, a

---

[8] *But see State v. Dinsmore*, 200 Or App 432, 444-45, 116 P3d 226 (2005), *aff'd*, 342 Or 1, 147 P3d 1146 (2006) (distinguishing *Newton* while recognizing the "coercive effect of the implied consent law"); *State v. Trenary*, 114 Or App 608, 612, 836 P2d 739 (1992), *aff'd*, 316 Or 172, 850 P2d 356 (1993) (discussing application of "coerced by fear of adverse consequences" policy of implied consent law under *Newton*).

warrant could have been obtained without sacrificing evidence. For the reasons that follow, we agree with the trial court that the state failed to meet its burden to prove this exception to the warrant requirement.

■ In order for the state to discharge that burden, in order to allow admission of a blood sample obtained without a warrant, the state must prove the following: (1) the police had probable cause to believe that defendant's blood contained evidence of a crime, *i.e.*, alcohol, and that analysis of the blood would yield that evidence; (2) a warrant could not be obtained without sacrificing that evidence; and (3) the extraction was made promptly once defendant was taken to a place where the extraction could be made. *State v. Moylett*, 313 Or 540, 548-49, 836 P2d 1329 (1992).

Ladd had probable cause to believe that defendant was intoxicated based on his investigation at the crime scene. The only issue is whether that evidence would have dissipated in the time that it took to obtain a search warrant. We recently observed in *State v. Kruse*, 220 Or App 38, 42, 184 P3d 1182 (2008):

> "In the context of DUII, exigent circumstances may exist when police officers who have probable cause to arrest a suspect are confronted with a situation in which evidence of the suspect's intoxication will be destroyed by the natural dissipation of alcohol during the time it takes to secure a warrant.

> "That does not mean, however, that warrants are not required in DUII cases. In *State v. Roberts*, 75 Or App 292, 296, 706 P2d 564 (1985), for example, we held that the potential destruction of evidence may justify a warrantless entry into a suspect's home '*if the state proves that the arresting officers could not have obtained a warrant before the alcohol in the suspect's body dissipated.*' "

(Citation omitted; emphasis in *Roberts*.)

■ In this case, the state failed to prove that a warrant could not have been obtained within a reasonable time to secure the evidence. In fact, Ladd testified that, in his experience, a warrant could be obtained in as little time as one hour and that the blood was obtained from defendant one hour and eight minutes after Ladd developed probable

cause.[9] There was no testimony that Ladd could not have obtained a warrant given the demands of immediate and necessary tasks. In light of Ladd's testimony and the actual time that elapsed between when Ladd developed probable cause and when the blood was extracted, the state was not relieved of its duty to obtain a warrant under Article I, section 9. The requirement to obtain a warrant is not excused by the mere fact that alcohol dissipates in the bloodstream over time.

Because the state failed to meet its burden to prove that exigent circumstances existed or that a voluntary consent to search was given, the unlawfully seized evidence should have been suppressed. *See State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005).

Reversed and remanded.

**HASELTON, J.,** dissenting.

The majority's conclusion that defendant's consent to the blood draw was invalid, as involuntary, is ultimately, erroneously premised on a single sentence in the plurality opinion in *State v. Newton*, 291 Or 788, 801, 636 P2d 393 (1981), *overruled in part on other grounds by State v. Spencer*, 305 Or 59, 750 P2d 147 (1988). That aspect of the *Newton* plurality is not binding, has never been cited, much less ratified, in the intervening 28 years, and is patently wrong. Accordingly, I respectfully dissent.

In holding that defendant's consent to the blood draw was not voluntary, the majority opinion concludes that the "determinative" consideration was that "the consent was procured through a threat of economic harm and loss of privileges. It was obtained only after defendant was given the warnings required by ORS 813.130(2) about the consequences of a refusal to allow a blood test." 231 Or App at 240.[1]

---

[9] The record in this case is unique, and different facts could allow a court to conclude that the exigency of loss of evidence of blood alcohol content excuses the need to obtain a warrant for that evidence under Article I, section 9, and the Fourth Amendment. The particular facts in this case suggest that the precedential value of this opinion—and the practical effect of the application of *Newton* to the consent issue—may be limited.

[1] The majority opinion also referred to other circumstances, including that, at the time defendant consented to the blood draw, he was under arrest and under the influence of alcohol, and had been injured in the automobile accident shortly

That conclusion is, in turn, ultimately predicated on a single sentence in the *Newton* plurality opinion:

> " 'Where a person's consent to a seizure is solicited, and the person consents only after being warned that he will suffer a substantial penalty if he refuses, the resulting consent cannot be regarded as a free exercise of will.' "

231 Or App at 240-41 (quoting *Newton*, 291 Or at 801).

The majority's treatment of that statement as immutably binding is erroneous. That is so, jurisprudentially and practically, for any of several reasons.

First, that statement was made in a plurality opinion, not a majority opinion, of the Supreme Court. Three justices, including the author, Justice Tanzer, joined in the *Newton* plurality. Justice Tongue, "specially concurring," "concur[red] in the *result* reached by the opinion by Tanzer, J.," 291 Or at 813 (emphasis added), without any reference to the plurality opinion's treatment of "consent."

Further, in concurring in the plurality's "result," Justice Tongue did not, by necessary implication, join in the plurality's "holding" with respect to consent. That is so because, even within the context of the *Newton* plurality, that opinion's treatment of consent was not essential to its result—*viz.*, that the trial court had *erred* in *suppressing* the results of the defendant's breath test. The plurality, after concluding that the defendant's consent was not voluntary— a determination that militated *in favor of* suppression— proceeded, in the next paragraph, to conclude that the warrantless seizure of the defendant's breath sample was, nevertheless, constitutionally valid under the probable cause/ exigent circumstances exception to the warrant requirement. *Id.* at 801-02. Given that conclusion, the *Newton* plurality's treatment of consent was gratuitous.

In the 28 years since *Newton*, neither the Supreme Court nor this court has ever ratified the plurality's gratuitous and conclusory treatment of consent. It is a barren

---

before. 231 Or App at 239-40. Not surprisingly, given that the first two of those circumstances are almost invariably present when a suspect consents to a blood draw or breath test—and the third is hardly unusual—the majority does not treat those circumstances individually, or collectively, as decisive.

branch. Indeed, until today, no published opinion in the past 28 years has favorably cited that aspect of the *Newton* plurality.

That is unsurprising, because the *Newton* plurality's treatment of consent was, and is, wrong. According to the *Newton* plurality, merely informing a suspect of the statutorily prescribed consequences of refusal is impermissibly "coercive." The upshot is that there can *never* be an enforceable consent for constitutional purposes when the police have complied with ORS 813.100(1) and ORS 813.130(2).[2] Even if the defendant expressly consents, it is worthless as a constitutional matter.[3] Indeed, if the *Newton* plurality's proposition were taken literally, it would preclude constitutionally effective consent *even after a DUII suspect consults with counsel*, because the "coercive" effect of the statutorily prescribed warnings would impermissibly skew the suspect's calculus in determining whether to consent.

That is not the law. Informing a citizen of statutorily prescribed consequences that will *as a matter of law* flow from a refusal is not, and cannot be deemed, impermissibly coercive for constitutional purposes. Contrary to the *Newton* plurality's unamplified *dictum*, we and the Supreme Court have repeatedly reiterated the principle that an accurate statement of lawful consequences is not coercive with respect

---

[2] ORS 813.100(1) provides, as pertinent, that, before "a chemical test of the person's breath, or of the person's blood if the person is receiving medical care in a health care facility immediately after a motor vehicle accident" is administered, "the person requested to take the test shall be informed of consequences and rights as described under ORS 813.130."

ORS 813.130(2), in turn, prescribes the content of the "information about rights and consequences," including the consequences of refusing or failing a test under ORS 813.100, *e.g.*, inculpatory use of the refusal or failure, automatic suspension of driving privileges, and, in the case of refusal, impaired eligibility for a hardship permit and exposure to a fine of not less than $500 and not more than $1,000.

[3] Nevertheless—and somewhat incongruously—the administering officer would still be obligated, as a statutory matter, to confirm the suspect's willingness to submit to the breath test or blood draw. *See* ORS 813.100(2) (precluding administration of a "chemical test of the person's breath or blood" if the person refuses the request to submit after being "informed of consequences and rights as described under ORS 813.130"); *see generally State v. Kirsch*, 215 Or App 67, 168 P3d 318 (2007) (addressing application of ORS 813.100(2) where the defendant driver, after initial refusal, was invited by administering officer to reconsider and ultimately agreed to submit to breath test).

to a defendant's consent to search. *See, e.g., State v. Hirsch*, 267 Or 613, 622, 518 P2d 649 (1974) (quoting with approval Chief Justice O'Connell's observation in dissent in *State v. Douglas*, 260 Or 60, 81, 488 P2d 1366 (1971): "But not all coercion inducing consent to a search is constitutionally impermissible. If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable."); *State v. Bowen*, 137 Or App 327, 331, 904 P2d 1076 (1995), *rev den*, 323 Or 74 (1996) ("Under state law, consent is not involuntary simply because police threaten 'to do what the law permits them to do.' " (quoting *State v. Williamson*, 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring) (some internal quotation marks omitted))).

*Smith v. Washington County*, 180 Or App 505, 43 P3d 1171, *rev den*, 334 Or 491 (2002), exemplifies that principle. There, we rejected a contention that submission to courthouse security screening procedures was coerced, not consensual, because citizens "are forced to submit as a condition of entering the courthouse." *Id.* at 511. In so holding, we emphasized that "valid 'consent' occurs when a citizen submits to a search rather than face a disagreeable alternative *if* the choice to which the government puts the citizen is itself lawful." *Id.* at 512 (emphasis in original). *See also State ex rel Juv. Dept. v. Stephens*, 175 Or App 220, 227, 27 P3d 170 (2001) (noting that, when "a defendant is confronted with the reality of what the law permits government officials to do if consent is refused," "[t]he decision whether to consent, when made in the face of such a legal reality, is not enough, in and of itself, to render the consent involuntary for constitutional purposes").

The irony, of course, is that, under the majority's analysis, the state is "damned if it does, and damned if it doesn't": If officers convey the statutorily prescribed information, as mandated under ORS 813.100(1), it is impermissibly "coercive"—and, if they do not, they have violated their statutory duties. The latter would, in turn, beget yet another irony: Because the failure to convey the statutorily prescribed consequences to a suspect who consents to a breath test or blood draw does not give rise to suppression, *see State v. Bloom*, 216 Or App 245, 251-52, 172 P3d 663 (2007), *rev*

*den,* 344 Or 280 (2008), under the majority's analysis, the state is actually better off if police officers violate their statutory duties rather than comply with them. The *Newton* plurality did not, of course, acknowledge, much less grapple with, those fundamental incongruities.

In sum, the *Newton* plurality is neither binding nor correct with respect to the voluntariness of defendant's consent to the blood draw in this case. Rather, in the totality of the circumstances, defendant's consent was voluntary; accordingly, the warrantless seizure of defendant's blood was lawful. The trial court's denial of suppression must be affirmed.[4]

Landau, Armstrong, and Schuman, JJ., join in this dissent.

---

[4] Given that conclusion, I need not, and do not, address whether the warrantless seizure of defendant's blood was independently lawful under the probable cause/exigent circumstances exception. I would note, however, that the practical consequence of the majority's reasoning in that regard, *see* 231 Or App at 245-47, is that—because it is impossible to know at the outset how long it will take to actually obtain a blood sample or breath test—the state, as a prophylactic matter, would be obligated in virtually every case to obtain a warrant before administering a breath test or drawing blood.